# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE ROCKET COMPANIES, INC. STOCKHOLDER DERIVATIVE LITIGATION | ) ) ) ) | Consolidated C.A. No. 2021-1021-KSJM |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: November 18, 2024
Date Decided: June 2, 2025

Michael J, Barry, Christine M. Mackintosh, Vivek Upadhya, Jonathan C. Millis, GRANT & EISENHOFER, P.A., Wilmington, Delaware; Jeffery S. Abraham, Michael J. Klein, ABRAHAM FRUCHTER & TWERSKY, LLP, New York, New York; Lee Squitieri, SQUITIQUERI & FEARON, LLP, New York, New York; James S. Notis, Jennifer Sarnelli, GARDY & NOTIS, LLP, New York, New York; Fletcher Moore, Justin Kuehn, MOORE KUEHN, LLP, New York, New York; *Co-lead Counsel for Co-lead Plaintiffs Doris Shenwick Trust and Christopher Vargoshe*.

William M. Lafferty, Ryan D. Stottmann, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Elena C. Norman, YOUNG CONAWAY STARGATT & TAYLOR, Wilmington, Delaware; Sharon L. Nelles, Jeffrey T. Scott, Julia A. Malkina, SULLIVAN & CROMWELL LLP, New York, New York; *Counsel for Defendant Rock Holdings Inc. and Nominal Defendant Rocket Companies, Inc.*

**McCORMICK, C.**

The plaintiffs own stock in Rocket Companies, Inc. ("Rocket" or the "Company"). They brought this derivative suit for insider trading against Rocket's controlling stockholder, Rock Holdings, Inc. ("RHI"). Under *Brophy v. Cities Services Co.*,[1] a plaintiff must prove two elements to establish liability for insider trading: first, that the fiduciary possessed material, non-public company information; and, second, that the fiduciary used that information improperly by making trades motivated by the substance of that information. The plaintiffs claim material, non-public information concerning a projected decline in a key financial metric motivated RHI to sell $500 million worth of stock on March 29, 2021. But the plaintiffs did not prove motive. This decision enters judgment for RHI.

## I. FACTUAL BACKGROUND

Trial took place over three days. The record comprises 427 trial exhibits, live testimony from seven fact and four expert witnesses, deposition testimony from eighteen witnesses, and thirty stipulations of fact.[2] These are the facts as the court finds them after trial.

---

[1] 70 A.2d 5 (Del. Ch. 1949).

[2] This decision cites to: C.A. No. 2021-1021-KSJM docket entries by docket ("Dkt.") number; the trial exhibits (Dkt. 163) by "JX" number; the trial transcript ("Trial Tr.") (Dkts. 187–189) by page and line numbers; and stipulated facts in the parties' Joint Pre-Trial Order ("PTO") (Dkt. 172). The following witnesses testified live at trial: Panayitois (Pete) Mareskas (Rocket Mortgage Treasurer); Scott Elkins (Rock Ventures Chief Investment Officer); Matthew Rizik (RHI Treasurer; Rock Ventures CEO & Chief Tax Officer); Jay Farner (Former RHI CEO & Director); Micah Officer (Plaintiffs' Expert); John Coates (Defendants' Expert); Terrence Hendershott (Defendants' Expert); Dan Gilbert (Rocket Founder & Chairman); Laura Grannemann (Gilbert Family Foundation & Rocket Community Fund Executive Director); Robert Walters (Former Rocket COO & President); and Mark Garmaise (Defendants' Expert). The parties submitted the deposition transcripts of the live

## A. Rocket's Public Launch

Daniel Gilbert founded Rocket in 1985.[3] In 1998, he saw an opportunity to pioneer digitized mortgages.[4] By 2019, Rocket had grown into one of the nation's largest mortgage lenders, with over $5 billion in revenue that year.[5] Rocket was a private company, and Gilbert owned Rocket through RHI.[6]

Gilbert has dedicated billions of dollars to charitable causes, such as curing neurofibromatosis, ending homelessness, and improving housing stability.[7] He is particularly committed to the City of Detroit. In 2010, Gilbert moved Rocket's headquarters to downtown Detroit as part of a revitalization effort.[8] The Gilbert family formed the Gilbert Family Foundation to pursue their philanthropic endeavors.[9] Rock Ventures manages, oversees, and provides professional services for the Rocket family of companies.[10]

---

witnesses and called the following witnesses by deposition only: Angelo Vitale (Rocket's General Counsel & Secretary); Bill Emerson (Rocket's President, COO & Rule 30(b)(6) representative); Brian Brown (Rocket's Chief Accounting Officer); Jonathan Mariner (Rocket Board Member); Laura Starks (Defendants' Expert); Linda Shenwick (Lead Plaintiff); Christopher Vargoshe (Lead Plaintiff). The court cites to the transcripts of the witnesses' respective depositions using the witnesses' last names and "Dep. Tr."

[3] PTO ¶ 32; JX-32 at 10.

[4] Trial Tr. at 637:2–10 (Gilbert).

[5] JX-32 at 120.

[6] PTO ¶¶ 18, 20, 35–36.

[7] Trial Tr. at 173:1–174:3, 181:9–16 (Rizik); *id.* at 651:9–663:21 (Grannemann).

[8] *Id.* at 178:17–180:6 (Rizik); *id.* at 639:6–640:12 (Gilbert).

[9] *Id.* at 172:13–16 (Rizik).

[10] *Id.* at 171:9–12 (Rizik).

2

Gilbert suffered a life-threatening stroke in May 2019. This brush with death inspired him to increase his charitable giving.[11] At a holiday party that year, Gilbert raised the idea of taking Rocket public with Rocket's then-CEO Jay Farner, to whom Gilbert had ceded day-to-day control before the stroke.[12] Gilbert also spoke with Laura Grannemann, who oversees Gilbert's charitable giving,[13] about making a large-scale personal commitment to the City of Detroit.[14] Gilbert came to the conclusion that taking Rocket public would both "make sure that there was . . . liquidity available to the business in times of financial disruption" and also provide Gilbert sufficient liquidity to fund his philanthropic goals.[15]

Rocket launched an initial public offering ("IPO") on August 6, 2020.[16] RHI sold approximately 6% of its equity to the public.[17] RHI retained around 94% of Rocket's common stock after the IPO and remains Rocket's controlling stockholder.[18]

---

[11] *Id.* at 641:7–21 (Gilbert).

[12] *Id.* at 218:16–18, 237:23–238:8 (Farner); *id.* at 641:4–6 (Gilbert).

[13] *Id.* at 650:5–23 (Grannemann).

[14] *Id.* at 655:6–21 (Grannemann).

[15] *Id.* at 99:13–101:6 (Elkins); *see also id.* at 238:9–239:6 (Farner); *id.* at 177:6–178:11 (Rizik).

[16] PTO ¶ 35.

[17] *Id.*

[18] *Id.*

RHI's and Rocket's personnel overlap considerably. Farner is also CEO of RHI.[19] Gilbert chairs the boards of both companies.[20] And Farner, Gilbert's wife, and RHI executive Matthew Rizik are on both companies' boards.[21]

## B. Rocket Experiences A Record-Breaking Year.

Although the COVID-19 pandemic made aspects of Rocket's IPO challenging, the indirect effects of the pandemic led to a blockbuster year for the mortgage industry.[22]

Rocket earns almost all of its revenues by selling mortgages on the secondary market to government-sponsored enterprises ("GSEs"), which bundle loans into mortgage-backed securities.[23] The spread between Rocket's cost of originating or acquiring a mortgage, on the one hand, and the price at which it sells the mortgage on the secondary market, on the other hand, is Rocket's "gain on sale of loans."[24] This gain-on-sale revenue is expressed as a percentage called "gain-on-sale margin" ("GOSM"). Rocket calculates GOSM by dividing the net gain on sale of loans by the net rate lock volume for a given period.[25]

---

[19] *Id.* ¶ 21.

[20] *Id.* ¶ 20.

[21] *Id.* ¶¶ 20–22, 29.

[22] Trial Tr. at 103:10–15 (Elkins); *id.* at 674:22–675:5 (Walters).

[23] *Id.* at 667:1–671:3 (Walters); *id.* at 671:8–14 (Walters); JX-380 ("Officer Expert Report") ¶¶ 17–18; JX-32 at 125.

[24] JX-32 at 125; Trial Tr. at 675:19–24 (Walters).

[25] JX-245 at 64; Trial Tr. at 12:12–13:17 (Mareskas). The "net rate lock" refers to "the actual rate locks that pull through to application and ultimately coming into [Rocket's] system and having a chance to close." Emerson Dep. Tr. at 62:10–17; *see also* Trial Tr. at 668:20–23 (Walters) ("So the client would lock their interest rate

The GOSM reflects both macroeconomic and firm-specific factors. As for macroeconomic factors, the GOSM closely tracks the market-driven spread between primary and secondary mortgage-loan interest rates—the rates that consumers pay versus the rates that the secondary mortgage-backed security yields—the higher the spread, the greater the revenue for Rocket.[26] As for firm-specific factors, Rocket originates mortgages through one of two channels: the "Direct to Consumer" channel, where Rocket's clients interact with its sales team directly or online; and the "Partner Network," where Rocket connects clients to other mortgage brokers, banks, and consumer-focused companies.[27] The GOSM reflects the mix of business generated through the Direct to Consumer and Partner Network channels.[28]

Between 2017 and 2019, the primary-secondary spread remained relatively constant, hovering around 0.9%.[29] Between 2017 and 2019, the year-end GOSM was 3.97%, 3.55%, and 3.19%, respectively.[30]

The year 2020 brought historically high primary-secondary spreads. In response to the COVID-19 pandemic, the Federal Reserve reduced interest rates, mortgage rates "hit record lows," "[a]lmost everyone in America got refinanced," and

---

because they didn't want the uncertainty of having that rate rise. So they would lock that interest rate.").

[26] Trial Tr. at 675:17–24 (Walters).

[27] JX-245 at 7; Officer Expert Report ¶ 16; Trial Tr. at 676:14–22 (Walters).

[28] Trial Tr. at 676:9–22 (Walters); *id.* at 13:23–15:1 (Mareskas).

[29] JX-382, Tab "BBG Index Data."

[30] JX-32 at 42.

the government increased GSE purchases.[31] That resulted in "the largest mortgage market in the history of the United States."[32] In March 2020, the spread doubled its historical average of 0.9%, widening to 1.79%, and Rocket's GOSM reached a historic high of 5.19% in Q2 2020.[33]

Still, everyone predicted that the mortgage industry would begin to return to normal. Analysts covering Rocket after the IPO recognized that lending would decline, and margins would begin to normalize in 2021.[34] Rocket's August 2020 IPO prospectus similarly cautioned that the inevitable rise in rates would impact Rocket's business.[35] Rocket publicly disclosed in September 2020 that the GOSM would likely normalize.[36] Shortly after, Rocket's GOSM began to fall. In November 2020, Rocket reported that its GOSM had fallen from 5.19% in Q2 to 4.52% in Q3.[37]

Rocket announced its Q4 and year-end 2020 results on February 25, 2021.[38] Rocket reported that the GOSM dropped from 4.52% in Q3 to 4.41% in Q4 2020, totaling an average of 4.46% for the fiscal year.[39] Revenue increased to $15.7 billion

---

[31] Trial Tr. at 30:2–8 (Mareskas); JX-32 at 55.

[32] Trial Tr. at 319:13–14, 322:8–13 (Farner).

[33] JX-82 at 3, 13; JX-382, Tab "BBG Index Data"; JX-388 (Germaise Expert Report) ¶ 52.

[34] *See* JX-379 ("Starks Expert Report"), Exs. 1, 6 (quoting analyst reports published between August 2020 and February 2021).

[35] JX-32 at 23, 25, 54–55.

[36] JX-52 at 8 (CFO Booth advising during September 2, 2020 earnings call that "we'll probably see those margins come back to more normalized levels").

[37] *Compare* JX-382, Tab "Fig 12 P-S Ratio," *with* JX-104 at 6–7.

[38] JX-160.

[39] *Compare* JX-104 at 6, *with* JX-160 at 3.

in 2020, up from $5.1 billion in 2019.[40]  Net income increased from $0.9 billion in 2019 to $9.4 billion in 2020.[41]  By all accounts, these were "record-breaking" results for Rocket.[42]  Still, Rocket expected the GOSM to decline to between 3.6% to 3.9% in Q1 2021.[43]

Farner, CFO Julie Booth, and COO Robert Dean Walters held an earnings call to discuss the Q4 and year-end 2020 results on the day they were announced.[44]  When asked about the trajectory of the GOSM over the remaining year, Booth stated that "the midpoint for our guidance is roughly 95% higher than our Q1 volume" and "the flexibility of our platform . . . allows us to really run our business for long-term growth and for profitability in any environment.  And we're really feeling good about the momentum that we're seeing."[45]  When asked about the effect of rising interest rates on GOSM in the coming year, Walters stated that Rocket's brand "really allows for the consistency of those margins.  So not only are we able to protect those but also gain share in these sorts of environments."[46]  Farner echoed this sentiment, sharing that as a market compresses, "not only does the margin stabilize and give you the

---

[40] JX-160 at 1.

[41] *Id.*

[42] *Id.* at 1.

[43] *Id.* at 6.

[44] JX-172.

[45] *Id.* at 8.

[46] *Id.* at 9–10.

opportunity to see that increase, but it also gives you . . . great opportunity to grow market share" due to "fewer competitors."[47]

The market responded positively to the Q4 and year-end 2020 results. Before Rocket announced the results, its stock price closed at $20.32.[48] By March 2, the stock closed at $41.60.[49]

### C.     Events Leading To The Challenged Sale

#### 1.     RHI Considers A Secondary Offering.

Gilbert and his team had set an IPO target of $3.5 billion.[50] The IPO raised only $2 billion.[51] To make up the shortfall, RHI began considering a secondary offering almost immediately after the IPO.[52] Gilbert authorized Farner and Rock Ventures's Chief Investment Officer, Scott Elkins, to lead the process.[53] After authorizing the sale, Gilbert was not involved.[54] Elkins assessed market conditions and made recommendations, and Farner had final say.[55]

---

[47] *Id.* at 12.

[48] Dkt. 164 ("PTO, Ex. A") at 4.

[49] *Id.* Professor Officer attributes some of the stock activity to meme trading. Officer Report ¶ 83 & n.75.

[50] Trial Tr. at 149:9–14 (Elkins).

[51] *Id.* at 101:22–103:15 (Elkins); *id.* at 242:21–245:1 (Farner).

[52] *Id.* at  245:20–246:3 (Farner); *id* at 104:11–20 (Elkins); *id.* at 182:5–17 (Rizik).

[53] *Id.* at 186:11–13 (Rizik); *id.* at 266:18–24 (Farner); *id.* at 642:16–643:3 (Gilbert).

[54] *Id.* at 642:16–243:10 (Gilbert).

[55] *Id.* at 104:24–105:2 (Elkins).

8

On October 30, 2020, Rocket filed a confidential secondary prospectus with the SEC.[56] Morgan Stanley advised that RHI would need to sell shares between $24 to $30 to achieve parity with the IPO and avoid negative effects on Rocket's stock price.[57] According to Elkins, RHI was "price-sensitive" and looking to sell additional shares "in the mid 20s."[58] Farner testified that RHI set out to obtain a fair price, which he pegged in the mid-$20s.[59] RHI decided against a sale in October 2020 because it was unable to get its desired price.[60]

## 2. The Trading Window Opens On March 1.

Rocket has an insider trading policy, which provides a trading window for Rocket's officers, directors, team members, and related parties to conduct transactions in Rocket stock.[61] These transactions must be pre-cleared by Rocket's general counsel,[62] and pre-cleared transactions must be performed "within two business days from the date of approval."[63] "If the transaction does not occur during the two-day period, pre-clearance of the transaction must be re-requested."[64]

---

[56] JX-111 at 144–539.

[57] JX-95 at 17; Trial Tr. at 107:11–15 (Elkins).

[58] Trial Tr. at 105:15–16 (Elkins).

[59] *Id.* at 265:17–24 (Farner); *see also id.* at 247:6–15, 251:23–253:4, 262:1–9, 298:5–11 (Farner).

[60] *Id.* at 109:15–20 (Elkins).

[61] JX-29 at 3–10.

[62] *Id.* at 6.

[63] *Id.* at 6–7.

[64] *Id.* at 7.

The trading window typically occurs one business day after the public release of Rocket's financial results and closes two weeks before the end of the fiscal quarter, but the insider trading policy allows the general counsel or senior management to open or close a trading window early.[65] The insider trading policy bars trading "while aware of . . . material nonpublic information . . . even during an open trading window."[66]

Rocket had a trading window from March 1 through March 17, 2021.[67] The next trading window was scheduled to open May 12, 2021.[68]

### 3. RHI Rejects A March 1 Offer To Sell Stock.

On March 1, Rocket's stock traded between $22.52 and $24.50.[69] That afternoon, Farner texted Elkins: "Secondary????"[70]

Elkins already had a call scheduled for that afternoon with Morgan Stanley when he received Farner's text.[71] An hour after receiving the text, Elkins reported:

> MS says they can sell relatively quietly without a roadshow now via a $500+ M 144a private issuance at ~$2 below the public share price provided we rep that there is no MNPI in the 10-K. They talked to 10 investors, [] including our

---

[65] *Id.* at 6; PTO ¶ 39.

[66] JX-29 at 6.

[67] PTO ¶ 40.

[68] *Id.*

[69] PTO, Ex. A at 4.

[70] JX-185 at 2; Trial Tr. at 111:24–112:9 (Elkins).

[71] Trial Tr. at 112:16–113:10 (Elkins).

current big holders. We would file a form 4 on a Friday night to minimize impact to the share price.[72]

In response, Farner instructed Elkins to tell Morgan Stanley that RHI "had no interest [in a secondary offering] at this time" because "[s]tock is going to 30 plus."[73] Consistent with these instructions, Elkins rejected Morgan Stanley's offer and told senior Rocket executives that Farner "wanted to wait for a higher price, eg $30+."[74] At trial, Farner and Elkins both credibly testified that the message was not intended to set a price floor of $30 on a secondary offering.[75] It was intended to signal to Morgan Stanley that RHI was not a desperate seller and place Morgan Stanley on notice that it cannot demand a large discount.[76]

On March 3, Farner publicly reiterated his positivity at the Morgan Stanley Technology, Media, and Telecom Conference. When asked about how Rocket would navigate increasing interest rates, Farner stated that Rocket had positioned itself "so we can protect our margin in all different interest rate cycles and grow our company."[77]

### 4.    The March 9 Compass Report

On March 4, United Wholesale Mortgages, one of Rocket's competitors, announced that it would not work with mortgage brokers that worked with its

---

[72] JX-186 at 2.

[73] *Id.*

[74] Trial Tr. at 120:3–11 (Elkins); JX-184 at 2.

[75] Trial Tr. at 120:3–7 (Elkins); *id.* at 261:17–24 (Farner).

[76] *Id.* at 260:16–261:24, 267:13–20 (Farner).

[77] JX-199 at 5.

11

competitors.[78]  This announcement meant that Rocket would have to be more competitive when compensating wholesalers, resulting in a lower GOSM margin for its Partner Network mortgages.[79]  Partner Network mortgages were an increasingly large part of Rocket's overall business, and this announcement signaled Rocket's overall GOSM could fall.[80]  Following the ultimatum, several analysts tracking Rocket predicted a decline in GOSM due to increased competition.[81]  They also predicted timelines for normalization that ranged from months to years.[82]

On March 9, Farner received a "Compass Report"—a weekly report circulated to Rocket's senior executives concerning various financial metrics.[83]  The Compass Reports typically span around forty pages and include comparisons of Rocket's projected GOSM against the analyst consensus, Rocket's ratio of Direct to Consumer versus Partner Network mortgages, and Rocket's forecasted change to GOSM on a week-to-week basis.[84]

---

[78] JX-203 at 1.

[79] Trial Tr. at 702:21–703:5 (Walters).

[80] *See* Officer Expert Report, Table 2; JX-203 at 1 (March 5, 2021 Bank of America analyst report noting, "It seems likely that RKT's volume and overall wholesale channel margins could face some pressure").

[81] *See, e.g.*, JX-203 at 1–2 (March 5, 2021 Bank of America analyst report); JX-219 at 1 (March 16, 2021 UBS analyst report).

[82] Starks Expert Report ¶ 60; JX-386 (Officer Expert Rebuttal Report) ¶ 28.

[83] JX-206; Trial Tr. at 15:11–18:1 (Mareskas).

[84] JX-206 at 23–27; Trial Tr. at 19:16–20, 42:1–4, 43:12–44:1 (Mareskas).

The March 9 Compass Report included forecasts for 2021 GOSM.[85] Since September 2020, Rocket's annual GOSM forecast was above analysts' expectations and its actual results were consistent with its internal projections.[86] The March 9 report forecasted a 2021 GOSM of 3.47%, which was below the market consensus of 3.54%.[87] Then-junior analyst Enzo Baretta prepared the March 9 Compass Report.[88] And then-director of finance Pete Mareskas reviewed and revised it before sending the final to senior executives.[89]

The parties dispute the reliability of this forecast, which was not prepared using the same methodology used for creating publicly disclosed projections.[90] To generate the number in Compass Reports, Mareskas started with Rocket's current GOSM performance and then "overlay[ed] [his] own qualitative expectations about how the coming year might play out."[91] Mareskas's "personal view on where rates would be headed or what the industry consensus was about what the mortgage market might be" informed his opinion.[92] Mareskas testified at trial that his forecasts

---

[85] JX-206.

[86] *See, e.g.*, JX-206 at 23; JX-400 at 22; JX-401 at 22; JX-402 at 22; JX-403 at 22; JX-404 at 22; JX-405 at 22; JX-406 at 22; JX-407 at 22; JX-408 at 33; JX-409 at 22; JX-410 at 22; JX-153 at 22; JX-190 at 22.

[87] JX-206 at 23.

[88] *Id*. at 15:19–16:1 (Mareskas).

[89] JX-158; JX-218; Trial Tr. at 18:2–21 (Mareskas).

[90] *Compare* Trial Tr. at 39:16–21 (Marsekas), *with id*. at 62:1–63:3 (Mareskas).

[91] *Id*. at 28:6–12 (Marsekas).

[92] *Id*. at 28:12–15 (Marsekas).

were not reliable.[93]  Rocket's former COO, by contrast, testified that he trusted Mareskas's work, though he noted that the predictions were less reliable further out.[94]

### 5. Farner Tells Elkins To Be Ready To Pull The Trigger On A Stock Sale.

On March 10, Rocket's stock price opened at $25.40, reached a high of $28.68, and closed at $25.95.[95]  Farner told Elkins that they "should be ready to pull the trigger" on the secondary.[96]  Elkins passed on Farner's instruction to other executives.[97]  That same day, Rocket executives discussed Gilbert's plan to announce a large charitable donation to the City of Detroit.  Elkins messaged Booth, asking whether Gilbert was

> confidentially planning an announcement for a donation for Detroit?  If so, when?  And how large?  We'd like to concurrently announce a secondary or 144A sale of RHI shares, eg $1+?  Please advise.[98]

### 6. The March 11 Messages

On March 11, Farner had been watching Squawk Box on CNBC, which airs between 6 and 9 a.m. Eastern time.[99]  Around 7:41 a.m., he began messaging Rocket's

---

[93] *Id*. at 26:20–27:22, 30:22–24, 37:9–22 (Marsekas).

[94] *Id*. at 680:22–682:5, 683:11–20, 703:9–24 (Walters).

[95] PTO, Ex. A at 4.

[96] JX-210 at 2.

[97] JX-209 at 4.

[98] *Id*. at 2.

[99] Farner Dep. Tr. at 394:6–398:9; *see also* Trial Tr. at 385:7–11, 337:8–14 (Farner). The court takes judicial notice of the airtime.

Chief Accounting Officer Brian Brown about a variety of issues, including the secondary offering.

Farner asked Brown about Rocket's 2019 revenue and then wrote: "Very possible we go back there with the inflation coming."[100] Farner continued that "if we can get our stock price to hold around $26 we need to do a secondary the day after [Gilbert] announces his . . . gift. Then we need to get prepared to hunker down for what could be a tough 24–36 months."[101]

In response, Brown confirmed that the plan was to file Rocket's 10 K on March 24, announce Gilbert's donation on March 25, and execute the stock sale on March 26.[102]

### 7. RHI Seeks Pre-Approval For A Stock Sale.

On March 19, Rizik submitted RHI's notice of exchange formally notifying Rocket of its intention to sell a large block of stock.[103] The notice advised that RHI would transfer up to 47,000,000 shares of Rocket's Class D and paired holding units in exchange for Class B common stock. RHI did not commit to selling a specific number of shares and instead stated it would provide a supplemental notice that sets forth the details of the sale.[104]

---

[100] JX-215 at 2.

[101] *Id.*

[102] *Id.*

[103] JX-230; PTO ¶ 41.

[104] JX-230 at 1.

Following advice from outside counsel, Rocket's legal counsel scheduled diligence meetings with senior management.[105] At 11:30 a.m., Rocket's General Counsel Angelo Vitale and Deputy General Counsel Tina John met with Farner to discuss whether there were any concerns with material non-public information that would prevent opening the trading window for a RHI stock sale.[106] Vitale determined it was reasonable to open the trading window and to pre-clear the sale.[107]

On March 22, Rocket's Audit Committee—comprising Rocket board members Rizik, Jonathan Mariner, Suzanne Shank, and Nancy Tellem—met to approve the sale.[108] At the beginning of the meeting, Rizik recused himself from voting due to his affiliation with RHI.[109] Farner and Vitale also attended this meeting.

The trading window had closed on March 17.[110] The committee therefore also discussed whether to open a trading window from March 22 to 24.[111] The committee members acknowledged that the trading window would not open again in the ordinary course until May 12, after the scheduled Q2 earnings announcement on May 5.[112] At the end of the meeting, the Audit Committee "voted unanimously to approve opening the trading window for a limited sale by RHI" of up to 47 million

---

[105] JX-296 at 5–6.

[106] JX-231.

[107] PTO ¶ 42.

[108] *Id.*; JX-236.

[109] JX-236 at 2.

[110] PTO ¶ 40.

[111] *Id.* ¶ 42.

[112] JX-236 at 3; JX-314.

shares.[113]  Under Rocket's insider trading policy, RHI either had to complete its trades by the end of business on March 24 or request pre-clearance from the Audit Committee again.[114]

### 8.     The March 23 Presentation

On March 23, the Board held its regularly scheduled meeting, which Farner attended.[115]

In advance of the meeting, Rocket's Corporate Finance Division created a presentation.[116]  The presentation reflected management's prediction that Rocket would achieve Q1 GOSM of 3.69%, and placed the Q1 GOSM guidance range at between 3.60–3.90%.[117]  On a less positive note, management reduced its full-year projection of GOSM from 3.50% down to 3.19%, below the analyst consensus of 3.50%.[118]  In raw numbers, this meant that Rocket's gain on sale revenue was projected to decrease from $10.46 billion to $9.51 billion.  Management attributed these decreases to increasing yields on 10-year treasury bonds.[119] An increase in 10-year treasury bond yields meant a compressed spread, which would negatively affect

---

[113] JX-236 at 3.

[114] JX-29 at 6–7.

[115] JX-240.

[116] JX-241 at 110–19.

[117] *Id.* at 117.

[118] *Id.* at 114, 118; JX-233 at 1.

[119] JX 240 at 6.

17

the GOSM.[120]  Management also expected mortgage refinancings to decrease by 80% over the remaining course of 2021.[121]

### 9. Farner Refuses To Authorize A Sale Because The Stock Price Was Too Low.

On March 24, Farner and Elkins discussed the stock sale again.[122]  Farner said he would "sell if we can net $22."[123]  That evening, Rocket's stock price closed at $22.54, and Farner canceled a discussion with other executives scheduled for the following morning concerning the sale.[124]  Farner refused to authorize a stock sale because the price was still too low, writing to Elkins:  "let's ho[pe] the stock goes up . . . Otherwise f[*]ck it."[125]

As planned, on March 25, the Gilbert Family Foundation and Rocket Community Fund announced a $500 million philanthropic investment in Detroit, which would be funded over a ten-year period.[126]  There was no specific timeline for raising the proceeds to fund the commitment.[127]

---

[120] *Id.*

[121] *Id.*; JX-241 at 113.

[122] JX-244 at 2.

[123] *Id.*

[124] JX-249.

[125] JX-244 at 2.

[126] JX-247.

[127] Trial Tr. at 184:4–185:8 (Rizik).

### 10. The Market Responds To The Collapse Of Archegos And Rocket's Stock Price Spikes.

The morning of March 26, the hedge fund Archegos Capital Management collapsed.[128] Before its demise, Archegos had amassed a large short position in Rocket with multiple banks as counterparties, including Morgan Stanley and Goldman Sachs.[129] Archegos's collapse triggered a rush to purchase Rocket stock to cover these short positions.[130] The day of the collapse, Rocket's stock price peaked at $24.13.[131]

The rise in trading price prompted Farner to revive the plan and set a goal of executing the sale on Monday, March 29, 2021.[132] He texted Elkins and others. In that conversation, Elkins expressed skepticism that the stock would trade above Farner's price target, stating that "[t]his is NOT going to price at $22 based on the stock closing at $24. The stock traded at $24 only for the last hour of trading when option traders were manipulating the market" and that "this likely prices at or below $20."[133] Farner responded "Ok well no reason to rush then."[134]

The trading price, however, continued to rise. Between 1 p.m. on Friday, March 26 and mid-morning Monday, March 29, the banks on the other side of

---

[128] JX-255.

[129] JX-385 ("Hendershott Expert Report") ¶ 25.

[130] *Id.* ¶ 27; JX-267.

[131] PTO, Ex. A at 4.

[132] JX-252 at 2–3.

[133] *Id.* at 3.

[134] *Id.*

Archegos's short purchased approximately 17.4 million shares (15.1% of Rocket's publicly tradeable shares) to unwind their positions.[135] The morning of March 29, Rocket's stock price was trading above $26.[136]

### 11. RHI Closes The Stock Sale On March 29.

On the morning of March 29, Elkins confirmed he had contacted Morgan Stanley, J.P. Morgan, and RBC about a potential block sale.[137] CFO Booth convened a thirty-minute diligence call with Vitale and John to ensure that RHI could sell once it settled on terms.[138] At 10:16 a.m., Elkins shared Morgan Stanley's terms with Rocket executives: $500 million worth of shares at a price of between $24 to $24.50.[139] The stock was trading at $26.92 and Morgan Stanley would receive a $2 discount. These were roughly the same terms as the Morgan Stanley deal Rocket rejected on March 1.[140] At 10:21 a.m., however, Elkins returned with a better price: $24.75.[141] Less than ten minutes later, Farner gave Elkins the go-ahead to execute the sale.[142]

RHI sold 20,200,000 shares of Rocket Class A stock in a private sale to Morgan Stanley at $24.75 per share, generating $499.95 million (the "Stock Sale").[143] Farner

---

[135] Hendershott Expert Report ¶¶ 68–69.

[136] JX-263.

[137] *Id.*

[138] JX-265.

[139] JX-263 at 2.

[140] JX-263; *see also* JX-186 at 2.

[141] JX-263 at 2.

[142] *Id.*

[143] PTO ¶ 44.

told executives that the Stock Sale would be made public on Wednesday and noted that "[i]t lines up with the 500mil donation [Rocket] and [Gilbert] committed to Detroit."[144] Rocket announced the Stock Sale through an SEC filing, which stated that Gilbert "plans to use his portion of the proceeds to help fund his recently announced $500 million commitment to revitalizing Detroit."[145] RHI continues to own around 93% of Rocket.[146]

### D. Q2 Guidance And Market Response

By mid-April, Rocket forecasted that the GOSM would decline significantly below previous guidance.[147] Rocket released its Q1 earnings and Q2 guidance on May 5, 2021.[148]

The Q1 results, as shown through its three key metrics, were well within previous guidance.[149] The closed loan volume and net rate lock both surpassed Rocket's expectations, and the GOSM was 3.74%, the midpoint of previous guidance and within analyst expectations.[150]

---

[144] JX-263 at 3.

[145] JX-413 at 2.

[146] JX-300 at 82.

[147] *Compare* JX-160 at 6 (forecasting a Q1 GOSM between 3.60% and 3.90%), *and* JX-241 at 118 (pegging analyst consensus at 3.81%), *with* JX-382, Tab "GOSM Internal Fcst Data" (forecasting total GOSM at 2.84% on April 12, 2021).

[148] JX-317.

[149] *Id.*

[150] *Id.* at 2.

The second quarter guidance raised concerns. Although the loan volume and net rate lock matched expectations, the GOSM range was 2.65%–2.95%.[151] The 2.80% midpoint was far lower than the 3.44% analysts had predicted and signaled that Rocket's margins were normalizing quicker than the market had anticipated.[152]

During Rocket's May 5, 2021 earnings call, Booth told investors the lower GOSM guidance was a result of changes in loan pricing, Rocket's investment in its Partner Network channel, and compression of the spread between the primary and secondary mortgage markets.[153] By the next day, Rocket's stock price dropped from $22.80 to $19.01.[154] The stock bottomed out at $16.58 on May 13.[155] Among other factors, analysts following Rocket attributed the lower stock price to Rocket's lower than expected GOSM guidance.[156]

### E. This Litigation

The Doris Shenwick Trust and Christopher Vargoshe (together, "Plaintiffs") filed derivative complaints against RHI and Gilbert on November 23, 2021, and

---

[151] *Id.* at 3.

[152] *Id.*

[153] JX-314 at 9.

[154] PTO, Ex A at 5.

[155] *Id.*

[156] JX-328 at 4; *see also,* Officer Expert Report ¶ 114.

February 2, 2022, respectively.[157] The court consolidated the two actions on February 14,[158] and Plaintiffs filed the operative complaint on March 21, 2022.[159]

Plaintiffs allege that RHI and Gilbert, as controlling stockholders, breached their fiduciary duties of loyalty and good faith by selling $500 million in stock on March 29 while in possession of material, non-public information.[160]

This court denied RHI's and Gilbert's motion to dismiss on March 1, 2023.[161] Plaintiffs later agreed to dismiss all claims against Gilbert with prejudice.[162] The court held a three-day trial on Plaintiffs' claim against RHI from May 20 through 22, 2024.[163]

## II. LEGAL ANALYSIS

A *Brophy* claim "rests on the premise that a fiduciary should not have taken advantage of [non-public] information to obtain a self-interested benefit."[164] To prevail on a *Brophy* claim, a plaintiff must prove that: "(i) the corporate fiduciary possessed material, non-public company information, and (ii) the corporate fiduciary used that information improperly by making trades because she was motivated, in

---

[157] Dkt. 1; C.A. 2022-0116-KSJM, Dkt. 1 (Vargoshe Complaint).

[158] C.A. 2021-1021-KSJM, Dkt. 19.

[159] Dkt. 29.

[160] *Id.* ¶¶ 83–88.

[161] Dkt. 57.

[162] Dkt. 147.

[163] Dkt. 186.

[164] *Goldstein v. Denner*, 2022 WL 1797224, at *8 (Del. Ch. June 2, 2022).

whole or in part, by the substance of that information."[165]  Plaintiffs bear the burden

of proving both elements by a preponderance of the evidence.[166]

Plaintiffs argue that RHI was in the possession of three pieces of material non-

public information that motivated the March 29 trade: (i) the March 9 Compass

Report; (ii)  Farner's knowledge of inflation and "hunker[ing] down" reflected in his

March 11 messages to Brown; and (iii) the March 23 Board Presentation.

Of Plaintiffs' three pieces of evidence, Farner credibly and consistently testified

that his views on inflation and hunkering down reflected in the March 11 messages

were in reaction to information he heard on Squawk Box.  Television shows are public,

so the March 11 text does not reflect non-public information.

For the purpose of analysis, this decision sidesteps the parties' extensive

disputes over whether the March 9 Compass Report and the March 23 Board

Presentation contain material non-public information.[167]  The court assumes that

Plaintiffs have proven this much.[168]  Even so, because Plaintiffs failed to demonstrate

---

[165] *Id.* at \*5 (citing *Kahn v. Kolberg Kravis Roberts & Co., L.P.,* 23 A.3d 831, 838 (Del. 2011)) (internal punctuation omitted).

[166] *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at \*9 (Del. Ch. Oct. 30, 2015), *judgment entered*, (Del. Ch. 2015), *order clarified*, (Del. Ch. 2015).

[167] *See generally* Dkt. 194 (Pls.' Post-Trial Opening Br.) at 54–59, 63–64; Dkt. 194 (Defs.' Post-Trial Answering Br.) at 26–42; Dkt. 202 (Pls.' Post-Trial Reply Br.) at 4–19.

[168] Because the analysis assumes and does not find that the information at issue is material, this decision also does not reach Plaintiffs' argument that *Oracle*'s "extreme deviation" standard should not apply to these facts.  *See* Pls.' Post-Trial Opening Br. at 33–35.

that any of this information motivated the Stock Sale, RHI is entitled to judgment in its favor.

Because entities are not sentient beings, when assessing the motives of an entity like RHI for the purpose of a *Brophy* analysis, the court must identify the humans responsible for the making the decision. Here, Gilbert owned RHI, but he was not involved with executing the secondary offering.[169] He authorized Farner and Elkins to pursue a sale, with Farner as the ultimate decision maker.[170] Thus, Plaintiffs must prove scienter as to Farner and Elkins or, at a minimum, Farner.

Farner and Elkins deny that the Stock Sale was motivated by material, non-public information.[171] That is not unusual; defendants typically do not admit to this element or state a nefarious intent plainly in contemporaneous documents. Proof of scienter often depends on circumstantial evidence. Relevant circumstantial evidence can include: the "temporal proximity" between the sale and when the defendant learned the material, non-public information; the "size of the trade relative to the defendant's overall stock holdings"; and whether the trade represents a "deviation from the sellers' past trading practices."[172] Here, Plaintiffs rely heavily on timing to make their case.

---

[169] Trial Tr. at 642:14–643:3 (Gilbert).

[170] *Id.* at 104:11–20 (Elkins); *id.* at 182:11–17 (Rizik).

[171] *Id.* at 146:11–147:21 (Elkins); *id.* at 381:23–384:1 (Farner).

[172] *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *16 (Del. Ch. Oct. 1, 2019).

Timing does not support Plaintiffs' case. The record reflects that, between the August 2020 IPO and the Stock Sale seven months later, Farner and Elkins continuously looked for opportunities to sell. In October 2020, Morgan Stanley advised that RHI would need to sell shares between $24 to $30 to achieve parity with the IPO and avoid negative effects on Rocket's stock price.[173] So RHI was looking to sell "in the mid 20s."[174] When the trading window opened on March 1, Rocket's stock was trading as high as $24.50.

To recap, the chronology from that point forward goes as follows:

- On March 1, the trading window opened and Rocket's stock traded between $22.52 and $24.50.[175] That afternoon, Farner texted Elkins: "Secondary????"[176] Morgan Stanley offered to acquire "$500+M 144a private issuance at ~$2 below the public share price[.]"[177] Elkins reported this to Farner, who instructed Elkins to tell Morgan Stanley that RHI had "no interest [in a secondary offering] at this time" because "[s]tock is going to 30 plus."[178]

- On March 9, Farner received the Compass Report forecasting a 2021 GOSM of 3.47%, which was below the market consensus of 3.54%.[179]

- On March 10, when trading opened at $25.40, Farner instructed Elkins to "be ready to pull the trigger" if a sale opportunity arose.[180]

- On March 11, Farner told Brown that "if we can get our stock price to hold around $26 we need to do a secondary the day after [Gilbert]

---

[173] JX-95 at 17; Trial Tr. at 107:11–15 (Elkins).

[174] Trial Tr. at 105:15–16 (Elkins); *see also id.* at 265:17–24 (Farner).

[175] PTO, Ex. A at 4.

[176] JX-185 at 2; Trial Tr. at 111:24–112:9 (Elkins).

[177] JX-186 at 2.

[178] *Id.*

[179] JX-206 at 23.

[180] JX-210 at 2.

26

announces his . . . gift."[181]  Based on views concerning inflation he apparently formed from watching CNBC, he then said: "[W]e need to get prepared to hunker down for what could be a tough 24–36 months."[182]

- On March 11, Elkins asked Rocket's internal lawyers, outside counsel at Paul Weiss, and finance personnel to undertake preparations for a potential sale.[183]

- On March 19, Rizik submitted RHI's notice of exchange, formally notifying Rocket of its intention to sell a large block of stock.[184]  The trading window had closed, so Farner met with Rocket's in-house attorneys to discuss whether there was any material non-public information that would prevent opening the trading window for a RHI stock sale.[185]

- On March 22, Rocket's Audit Committee met to approve a stock sale.[186] Rizik recused himself from voting due to his affiliation with RHI.[187] General Counsel Vitale determined that it was reasonable to open the trading window and pre-clear the sale.[188]  And the Audit Committee "voted unanimously to approve opening the trading window for a limited sale by RHI"[189] of up to 47 million shares.

- On March 23, Farner received a Board presentation reflecting management's predictions that Rocket would achieve Q1 GOSM of 3.69%, which was within guidance, but fall by year end to a GOSM of 3.19%, which was below analyst consensus.[190]

---

[181] JX-215 at 2.

[182] JX-215 at 2.

[183] JX-212; JX-209 at 4.

[184] JX-230; PTO ¶ 41.

[185] JX-231.

[186] JX-236; PTO ¶ 42.

[187] JX-236 at 2.

[188] *Id.* at 2–3.

[189] *Id.* at 3.

[190] JX-241 at 114, 117–18.

- On March 24, Farner refused to authorize a stock sale because the price was still too low, writing to Elkins: "let's ho[pe] the stock goes up. Otherwise f[*]ck it."[191]

- On March 26, the hedge fund Archegos Capital Management collapsed, and the trading price of Rocket stock went up.[192] Farner instructed his team to look into a sale, but that evening Elkins told Farner that the stock "is NOT going to price at $22 based on the stock closing at $24."[193] Farner responded: "no reason to rush" on trying to execute a sale.[194]

- On March 29, the next trading day after Archegos's collapse, abnormal trading activity caused Rocket's stock price to rise above Farner's long-desired price, and banks started "reach[ing] out to [RHI] wanting to purchase [Rocket] shares."[195] RHI consummated the Stock Sale that day.

This timeline does not show that Farner or Elkins were motivated by the March 9 Compass Report or March 23 Board Presentation. Rather, it reflects that Farner and Elkins put the wheels in motion when the trading window opened on March 1, prepared to "pull the trigger" mid-way through the trading window when the stock price started to rise, sought formal approval mid-way through the window, and involved internal counsel, external counsel, and the independent Audit Committee members in a sale process with a documented paper trail. After Farner received the March 9 Compass Report and the March 23 Board Presentation, he put the brakes on the sale because the stock was not trading at his desired target. It was not until Archegos collapsed on March 26, and Farner and Elkins were positive that

---

[191] JX-244 at 2.

[192] JX-255.

[193] JX-252 at 3.

[194] *Id.*

[195] Trial Tr. at 363:11–16 (Farner); *see* JX-263.

Rocket's trading price would support a sale price in the mid-$20s, that Farner approved the sale.

Plaintiffs emphasize different aspects of the timeline. Their primary argument is that Farner decided to sell on March 10, based on the March 9 Compass Report, when the stock price was in the mid-$20s. They say that this was an "abrupt U-turn" from Farner's stated position on March 1 that he would not sell under $30.[196] But Farner and Elkins both testified that the statement to Morgan Stanely was not intended to set a price floor of $30. Rather, it was intended to signal to Morgan Stanley that RHI was not a desperate seller.[197] This testimony rang true and was consistent with the longer timeline, dating back to October 2020, that reflected that RHI had to sell shares between $24 to $30 to achieve parity with the IPO and avoid negative effects on Rocket's stock price.[198]

Plaintiffs argue that Farner could not have intended to convey a negotiating position to Morgan Stanley because block-trade pricing was non-negotiable, but that seems like an overstatement. And it is inconsistent with what happened next. On

---

[196] Pls.' Post-Trial Opening Br. at 15.

[197] Trial Tr. at 260:16–261:24, 267:13–20 (Farner).

[198] Plaintiffs challenge the veracity of Farner's testimony that he always had a mid-$20s price target, pointing to Farner's March 11 and March 24 messages to Brown. Pls.' Post-Trial Opening Br. at 63. But in his March 11 text, Farner stated that he would authorize a sale around the time of Gilbert's charitable announcement on March 25 if the price "hold[s] around $26," which was in the mid-$20s. JX-215 at 2. Rocket's stock price opened at $26.32 that morning. *See* PTO, Ex. A at 4. And in his March 24 text, Farner stated that he would authorize a sale if he could net $22 after the block-trade discount. JX-244 at 2. Plaintiffs acknowledge that doing so would require a stock price "around $24," which is also in the mid-$20s. Pls.' Post-Trial Opening Br. at 63.

March 29, Elkins negotiated up from $24.00 to $24.75.[199]  Plaintiffs contend that a true negotiation would have secured a larger discount, but this is undercut by the relatively short window RHI had to take advantage of the Archegos collapse trading activity.

Plaintiffs' theory based on the March 23 Board Presentation suffers other problems.  As RHI points out, to accept that the March 23 Board Presentation motivated Farner to sell on March 29, the court must find that Farner studied the annual GOSM projection of 3.19% in the March 23 Board presentation,[200] compared it to Rocket's Q1 GOSM projection of 3.69% elsewhere in the March 23 Board Presentation,[201] deduced that the Q2 GOSM could be no higher than 3.02%, compared that computed 3.02% figure to an analyst consensus figure for Q2 GOSM in an entirely separate March 22 report prepared by a vendor for Rocket's investor-relations team that Farner never received,[202] and concluded that RHI urgently needed to sell stock.  Despite this, Farner declined to sell in the following days, waiting for a fortuitous change in the stock price a week later caused by a hedge fund's collapse.  This is hard to accept.

---

[199] JX-263 at 2; Trial Tr. at 144:8–23 (Elkins).

[200] JX-241 at 114.

[201] *Id.* at 117.

[202] *See* Pls.' Post-Trial Opening Br. at 19, 40–42.  Although the March 23 Board Presentation contains an analyst consensus GOSM for 3.81%, this is only the consensus for Q1 2021.  *See* JX-241 at 118.  Farner would have had to look elsewhere to compare Rocket's projected GOSM with the analysts' projected GOSM in other quarters.  *See, e.g.,* JX-233 (March 22, 2021 internal email circulating Morgan Stanley report on analyst consensus).

The parties also dispute whether the Stock Sale was motivated by Gilbert's charitable commitment to the City of Detroit. Plaintiffs deny that it had anything to do with the charitable commitment, but that is an overstatement. As Gilbert testified, the statement in the Form 4 disclosing that Gilbert "plans to use his portion of the proceeds to help fund his recently announced $500 million commitment to revitalizing Detroit neighborhoods" was true and "accurately reflected [his] plan."[203] It is true that Gilbert's charitable commitment was a negligible factor motivating the sale, but that is a non sequitur. The Stock Sale was a long-contemplated continuation of the IPO process and intended to provide liquidity to Rocket's operating subsidiaries if needed.[204]

One other factor casts doubt on Plaintiffs' theory. Farner personally held 204,000 shares of Rocket stock (approximately $5 million worth based on the $23.80 closing price).[205] He did not sell a single share in response to the material, non-public

[203] Trial Tr. at 645:9–24 (Gilbert).

[204] JX-88 (October 2020 emails between Rocket executives and Morgan Stanley representatives discussing a follow-on offering after the IPO); JX-111 at 144–539 (Rocket's October 30, 2020 confidential secondary prospectus filed with the SEC); Trial Tr. at 266:1–24 (Farner) ("[G]oing back to the IPO and kind of the instructions that you need to explain to people where the funds are going or why you are doing a fundraise or something of that nature. Dan had been working on making an announcement for some months. And I think there was a nice opportunity to make sure we reinforced where the money was going."); *id.* at 124:21–125:7, 182:13–17, 193:15–194:2 (Rizik) ("[T]he purpose of the IPO and secondaries was—we were disappointed in the IPO—was to help fund the operations of the mortgage company so RHI could continue . . . But it was also to help Mr. and Mrs. Gilbert with their commitments to the city of Detroit. So the funds were available, should they be needed, to have Mr. Gilbert cause a distribution so that his share of the proceeds could be used to fund his commitments.").

[205] JX-300 at 82.

31

information, and was looking to buy over time. Farner's Rocket stock declined in value by nearly $800,000 when Rocket's stock price fell on May 6, 2021. If Farner was motivated by material, nonpublic information to trade before the stock price fell in May, one would think he would have attempted to save himself $800,000.[206] Plaintiffs respond that Farner's decision not to sell is irrelevant because, unlike Farner, RHI needed to make up for the IPO shortfall.[207] But it is hard to view a $800,000 drop in personal wealth as irrelevant.

In the end, Plaintiffs have not shown, by a preponderance of the evidence, that either the March 9 Compass Report or the March 23 Board Presentation motivated the Stock Sale. Because they failed to prove an essential element of their *Brophy* claim, they have not met their burden.

## III. CONCLUSION

Judgment is entered in favor of RHI. The parties must submit a form of order implementing this decision within seven business days.

---

[206] *Clovis Oncology,* 2019 WL 4850188, at \*16 (rejecting an inference that director defendants acted with scienter where plaintiffs alleged that they "notwithstanding their alleged knowledge of the corporate trauma soon to come . . . rode over the falls with the rest of the stockholders when the corporate storm hit the Company").

[207] Dkt. 202 (Pls.' Post-Trial Reply Br.) at 24–25.